UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

```
-----------------------------------------------X
VERIZON SERVICES                      :
ORGANIZATION INC.,                    :
                    Plaintiff,        :
                                      :      Civil Action No. 1:07 cv 00834 RWR
v.                                    :
                                      :
COMMUNICATIONS WORKERS OF             :
AMERICA, AFL-CIO,                     :
                                      :
                    Defendant.        :
-----------------------------------------------X
```

## VERIZON SERVICES ORGANIZATION INC.'S
## MOTION TO RECONSIDER THE STAY OF DISCOVERY

Pursuant to Federal Rule of Civil Procedure 26 and Local Civil Rules 5.2 and 7, Plaintiff and Counterclaim Defendant, Verizon Services Organization Inc. ("Verizon"), by and through its undersigned attorneys, hereby moves the Court to reconsider the stay of discovery in this proceeding and to permit limited discovery before the filing of dispositive motions.

As set forth more fully in the accompanying Memorandum in Support, Verizon is aware of extrinsic evidence that is directly relevant to both the objective meaning and the parties' intentions with respect to the contractual language that is at issue in this case. This evidence should be developed through discovery so that it may be considered by the Court in resolving this dispute about contractual interpretation. Accordingly, Verizon respectfully requests that the Court reconsider its order staying discovery in this case, postpone slightly the current schedule for the briefing of dispositive motions, and permit the parties to take no more than two depositions of the opposing party and/or a third party. A proposed Order is attached.

Dated:  November 21, 2007

Respectfully submitted,


_____ /s/ Thomas M. Beck _____
Willis J. Goldsmith (D.C. Bar No. 945956)
Thomas M. Beck (D.C. Bar No. 437680)
JONES DAY
51 Louisiana Avenue, N.W.
Washington D.C.  20001-2113
Phone:  (202) 879-3939
Fax:  (202) 626-1700

Attorneys for Plaintiff Verizon
Services Organization Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November 2007, a copy of the foregoing Plaintiff's Motion to Reconsider the Stay of Discovery, and the accompanying Memorandum in Support thereof and proposed Order, were electronically filed. Notice of the filing will be sent to all parties by operation of the Court's electronic filing system.

_____/s/ Thomas M. Beck_____
Attorney for Plaintiff Verizon Services Organization Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------------------------X
VERIZON SERVICES                          :
ORGANIZATION INC.,                        :
                        Plaintiff,        :
                                          :       Civil Action No. 1:07 cv 00834 RWR
v.                                        :
                                          :
COMMUNICATIONS WORKERS OF                 :
AMERICA, AFL-CIO,                         :
                                          :
                        Defendant.        :
-----------------------------------------------------X
```

## MEMORANDUM IN SUPPORT OF VERIZON SERVICES ORGANIZATION INC.'S MOTION TO RECONSIDER THE STAY OF DISCOVERY

Plaintiff and Counterclaim Defendant, Verizon Services Organization Inc.

("Verizon"), by and through its undersigned attorneys, hereby submits this Memorandum in

Support of its Motion to Reconsider the Stay of Discovery in this proceeding, and in support

thereof states as follows:

### I.      PRELIMINARY STATEMENT

This case involves the interpretation of a neutrality and consent election agreement, and

Verizon's efforts to resist arbitrating a matter not covered by that agreement.  Verizon and

Defendant and Counterclaim Plaintiff, Communication Workers of America, AFL-CIO

("CWA") have entered into a Neutrality and Consent Election Memorandum of Agreement

("MOA") concerning CWA's attempts to organize certain Verizon employees.  The MOA

requires disputes that arise during the course of an organizing campaign to be submitted to

arbitration before a designated Third Party Neutral ("TPN").  After CWA lost an election at

Verizon's Long Beach MCOW facility, CWA sought to arbitrate its objections to Verizon's conduct during the organizing campaign that preceded the election. Although Verizon asserted that CWA's post-election objections were not substantively arbitrable under the MOA and, accordingly, that the TPN lacked jurisdiction to resolve the objections, the TPN nonetheless agreed to hear the merits of CWA's objections. That arbitration is now pending before the TPN in California.

At the August 29, 2007 scheduling conference in this matter, CWA convinced this Court to stay discovery by arguing, in part, that the TPN's decision in the California arbitration might resolve the arbitrability issue involved in these proceedings. However, notwithstanding CWA's representations, there is no end in sight in the arbitration. In any event, the TPN has made clear that he will not rule on the arbitrability question that is at issue in this case. Consequently, the dispute presented to this Court can only be resolved by this Court. Further, extrinsic evidence is available that is likely to assist the Court in resolving the question of contract interpretation that is central to this dispute. Limited discovery is necessary to pursue that extrinsic evidence. Accordingly, the Court should vacate its stay and permit limited discovery.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Scheduling Conference*

In the Proposed Scheduling Order Verizon submitted with the Case Management Plan jointly filed by the parties on August 24, 2007, and at the scheduling conference on August 29, 2007, Verizon requested the opportunity to take limited discovery. In support of its request, Verizon asserted that, because the MOA does not explicitly address the issue of post-election objections, "some extrinsic evidence may be enlightening to the Court." See Transcript of August 29, 2007 Case Management Conference (hereinafter, "Tr.) at p. 2, attached as Exhibit 1.

Specifically, Verizon argued that "there may be bargaining history that may be enlightening for the Court in ruling on this issue." Id. at p. 2-3. Verizon further explained that CWA has entered into neutrality and consent election agreements with other communications companies and that some of those agreements include language expressly permitting post-election objections; this suggests that the parties here did not intend for their MOA -- which does not explicitly mention post-election objections -- to permit such objections.

CWA asked the Court to stay these proceedings entirely. In support of its request, CWA asserted, among other things, (1) that discovery is unnecessary because the issue involved in this case may be resolved "by the face of the MOA"; (2) that the issue may be disposed of by the ongoing arbitration in California; and (3) that the arbitrator's findings and conclusions "will provide a more complete [] backdrop for this Court's consideration of the issue." Id. at pp. 4-6. CWA also advised the Court that four days of arbitration hearing were scheduled for the month of October, and asserted that it made sense to stay these proceedings, because the "arbitration award will be rendered soon." Id.

At the conclusion of the scheduling conference, the Court struck a compromise between these competing positions. The Court partially granted CWA's request and stayed discovery, but set a schedule for the filing of dispositive motions. Id. at p. 11. The Court indicated that its decision was based upon the belief that "it may well be that between now and then the arbitration will result in something that will have some impact on where we go here." Id. Insofar as that might not be the case, the Court expressly invited Verizon to file a motion seeking to persuade the Court that discovery was necessary before the filing of the dispositive motions. Id. at p. 13.

**B.**    *The California Arbitration*

Since the August 29 Scheduling Conference, two days of hearings have been held in the California arbitration -- October 23 and 24, 2007.  <u>See</u> Declaration of Margaret Lesesne (hereinafter, "Lesesne Decl.") at ¶ 11, attached as Exhibit 2.  Contrary to CWA's representations at the conference, however, the arbitration is far from over.  After four days of hearing in August and two in October, CWA still has not concluded its case in chief.  <u>Id</u>.  Indeed, CWA's counsel remarked that she believed at least six to eight more hearing days would be necessary.  <u>Id</u>.  Even after CWA concludes its case, Verizon likely will require several additional days of hearing to present its own case.  <u>Id</u>. at ¶ 12.  Currently, five more hearing days have been scheduled for February 2008.  At this point, it is clear that the arbitration is not expected to conclude until some time well into 2008.  <u>Id</u>. at ¶ 13.  Thus, it is unlikely that the TPN will issue the arbitration award until long after the current dispositive motions deadline in this case has passed.

Moreover, even if the TPN were to issue the arbitration award in advance of the dispositive motions deadlines, the award would not (contrary to CWA's suggestion) dispose of the substantive arbitrability issue involved in this case.  The parties have not submitted the arbitrability issue to the TPN.  <u>Id</u>. at ¶ 10.  The TPN is addressing the merits of CWA's objections to Verizon's conduct during the organizing campaign, which involve allegations that Verizon took an anti-union position and campaigned against CWA in the period leading up to the consent election.  <u>Id</u>. at ¶ 9.  As a result, the evidence being presented in the arbitration is focused on Verizon's conduct related to the campaign.  <u>Id</u>.  The arbitration does not involve evidence bearing on the parties' intentions concerning post-election objections.  The TPN has made clear that he will not rule on the arbitrability issue.  <u>Id</u>. at ¶ 10.  Thus, there is no reason to

4

believe that his findings and conclusions would be relevant to the dispute that is presented by this case.

**C.**    ***CWA Previously Has Admitted That Agreements Like The MOA Do Not Permit Post-Election Objections***

In marked contrast to the evidence being presented in the California arbitration, which is not directed to the meaning of the MOA as it relates to post-election objections, Verizon is aware of extrinsic evidence that goes directly to the meaning of the MOA with respect to post-election objections.

Verizon has obtained a copy of a similar neutrality and consent election agreement between CWA and AT&T.  See Declaration of Don Haller (hereinafter, "Haller Decl.) at ¶ 4, attached as Exhibit 3.  The original version of the agreement, which became effective in 1998, did not explicitly address the availability of post-election objections.  Id.  However, in 2000, CWA and AT&T modified the agreement to include a new provision expressly authorizing the TPN to entertain objections within seven days *after* an election.  Id. at ¶ 5.  The evolution of the AT&T agreement raises a strong inference that, when Verizon and CWA entered into their MOA in 2005, CWA understood that an agreement lacking such a provision does not permit post-election challenges.

Verizon also has identified a witness who can confirm that CWA has admitted that, absent such a provision, these types of agreements do not allow post-election objections.  In late April or early May 2007, Verizon's Assistant General Counsel, Donald B. Haller ("Mr. Haller"), had a discussion with AT & T labor relations employee, Lori Smith ("Ms. Smith"), regarding the neutrality and consent election agreement between CWA and AT & T.  Id. at ¶ 3.  Ms. Smith had primary responsibility for administering that agreement.  Id. at ¶ 4.  In this conversation, Ms.

Smith told Mr. Haller that CWA had acknowledged in multiple verbal communications with her that the TPN had no jurisdiction to entertain post-election objections under the original agreement. Id. at ¶ 6. According to Ms. Smith, CWA specifically sought the 2000 modification to the agreement because it understood that the original agreement did not permit post-election objections. Id.

**D.      *Verizon Has Substantially Reduced The Amount of Discovery It Is Seeking***

Verizon has further restricted the scope of the already limited discovery it initially proposed in this matter, and specifically tailored its request to the particular evidence described above. In addition to a minimal number of document requests, interrogatories and possibly requests for admission, Verizon is now seeking only two depositions: (1) a witness from AT&T who is familiar with the bargaining history, scope and application of the neutrality and consent election agreement between AT&T and CWA; and (2) a CWA Rule 30(b)(6) designee who can testify about the bargaining history, scope and application of the MOA and CWA's neutrality and consent election agreements with other telecommunications companies. Although allowing the proposed discovery will require an adjustment to the current case schedule, the adjustment will be minor. If the Court accepts the schedule outlined in the proposed Order submitted with this Memorandum, the requested discovery will be complete by February 1, 2008, and the dispositive motion briefing process will be complete by March 28, 2008.

## III.      ARGUMENT

This Court should lift the stay of discovery in this proceeding because (i) CWA can no longer assert in good faith that the arbitrability issue involved in this case may be resolved in the California arbitration; and (ii) Verizon needs the opportunity to take discovery because there is

extrinsic evidence that bears directly on the central question of whether the MOA contemplates post-election objections.

As the above facts make clear, CWA's speculative assertions that the TPN would issue an arbitration award in the California arbitration soon after the hearing dates in October, and that the award might impact these proceedings, have proven incorrect.

CWA also is incorrect in its assertion that discovery is unnecessary in this case because the scope and application of the MOA may be resolved by the face of the MOA. While it is true that courts interpreting contracts, including labor agreements, generally prefer to base their interpretations on the plain meaning of the contract language, it is well established that courts regularly consider extrinsic evidence in situations where such evidence is offered to demonstrate the intent of the parties, to interpret the terms of the agreement because the contract language is ambiguous, or to determine the meaning of the contract where there is no language expressly addressing the particular situation that has arisen. See, e.g., Commonwealth Communications, Inc. v. NLRB, 312 F.3d 465, 468 (D.C. Cir. 2002) (holding that collective bargaining agreement was ambiguous, thus requiring the court to consider parol evidence of the parties' intent); United Mine Workers of America v. Bituminous Coal Operators, 898 F.2d 177, 181 (D.C. Cir. 1990) (explaining that "when interpreting collective bargaining agreements, extrinsic evidence of the meaning of disputed clauses such as past practice, related agreements, and bargaining history are quite properly considered to determine the parties' intentions, especially where the Agreement is ambiguous"); International Brotherhood of Electrical Workers, AFL-CIO v. NLRB, 797 F.2d 1027, 1036 (D.C. Cir. 1986) (cautioning that "the words parties use in drafting contracts are only evidence of their intent; the words are not themselves the parties' intent. The Board may not, in the guise of enforcing the 'plain meaning' of contractual language, erect an inflexible

presumption on an issue turning on the parties' <u>actual</u> intent.") (emphasis original); <u>Printing Specialties and Paper Products Un. Local 680 v. Nabisco Brands, Inc.</u>, 833 F.2d 102, 104 (7th Cir. 1987) (examining "a wealth of forceful [extrinsic] evidence" to determine that the parties did not intend for an issue to be the subject of arbitration); <u>Barco Urban Renewal Corp. v. Housing Auth.</u>, 674 F.2d 1001, 1009 (3rd Cir. 1982) ("ambiguous . . . contractual provision must be given an interpretation consistent with the dominant purpose of the contract"); <u>Pacific Northwest Bell Telephone. Co. v. Communications Workers of America</u>, 310 F.2d 244, 247 (9th Cir. 1962) (contract meaning "cannot be said" to be plain when the agreement is silent on a particular issue); <u>Cronin v. Sears, Roebuck & Co.</u>, 588 F.2d 616, 619 (8th Cir. 1978) ("Even where there exists some unambiguous contract provision, it is still proper for the parties to interpret" their agreement if the "agreement conflicts with industrial common law."); <u>Local 64, Am. Bakery and Confectionery Workers Int'l Un., AFL-CIO v. Hershey Chocolate Corp.</u>, 266 F.Supp. 276, 278 (M.D. Pa. 1967) (it is "well settled" that when interpreting a collective bargaining agreement, courts can consider "past practice of the parties and prior bargaining history" to determine the intent of the parties) (citations omitted).

Verizon maintains that the best interpretation of the plain language of the MOA is that it prohibits post-election objections.  <u>See</u> MOA, attached as Exhibit 4.  First, the plain language of the MOA only authorizes the TPN to address conduct through an organizing campaign.  <u>See</u> MOA Sections 1 and 8.  Although the MOA incorporates National Labor Relations Board ("NLRB") procedures for challenging ballots, <u>see</u> MOA Section 3, and substantive law concerning composition of the bargaining unit, <u>see</u> MOA Section 8, the MOA does not incorporate NLRB post-election processes.  Second, the plain language of the MOA repeatedly emphasizes the importance of prompt and certain resolution of objections, which clearly

contemplates that Verizon is entitled to a year of undisturbed peace after CWA loses an election. <u>See</u> MOA Sections 4 and 8. Interpreting the MOA as permitting post-election objections would create a moral hazard that, rather than timely objecting to allegedly improper conduct prior to an election, CWA will simply await the election results and seek a second bite at the apple any time it loses. For these, and other reasons Verizon will more fully explain in its dispositive motion, the clear intent of MOA is not to permit post-election objections.

However, it is true that the MOA does not explicitly prohibit post-election objections, and to the extent that this omission creates ambiguity, extrinsic evidence would aid the Court in its interpretation. Extrinsic evidence strongly supporting Verizon's position here exists in the form of the neutrality and consent election agreement between CWA and AT & T. Even a facial comparison of the MOA involved in this case and the original and amended versions of the AT & T agreement suggests that the MOA does not authorize post-election objections, and, in addition, that CWA understands this. And the fact that CWA has admitted as much is even more compelling evidence. In the interest of affording Verizon a full and fair opportunity to litigate this very important issue, Verizon should be allowed to develop this relevant evidence.

At the scheduling conference, CWA expressed an interest in finding "the most expeditious route to resolution of the issues before the Court." Tr. at p. 6. Verizon is equally interested in resolving these issues. <u>See</u> Lesesne Decl. at ¶ 6. The arbitrability question before this Court is a significant matter of disagreement between the parties. <u>Id</u>. at ¶ 5. The MOA covers all of the former GTE entities presently owned and/or operated by Verizon, which includes operations in more than 20 states, and regulates the parties' relationship well into the future. <u>Id</u>. at ¶ 3. There is every reason to believe that CWA will continue to try to game the system by rolling the dice and objecting to Verizon's conduct during an organizing campaign

9

every time it loses the election. <u>Id</u>. at ¶ 6. This outcome would deprive Verizon of the benefit of its bargain. <u>Id</u>.

## IV.    CONCLUSION

For all of the foregoing reasons, Verizon respectfully requests that this Court grant its Motion to Reconsider the Stay of Discovery.

Dated: November 21, 2007

Respectfully submitted,

_____/s/ Thomas M. Beck_____
Willis J. Goldsmith (D.C. Bar No. 945956)
Thomas M. Beck (D.C. Bar No. 437680)
JONES DAY
51 Louisiana Avenue, N.W.
Washington D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700

Attorneys for Plaintiff Verizon
Services Organization Inc.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VERIZON SERVICES, INC.,          :
                                 :    Civil Action
              Plaintiff,         :    No. 07-834
                                 :
v.                               :    August 29, 2007
                                 :    9:45 a.m.
COMMUNICATION WORKERS OF         :
AMERICA, AFL -- CIO, et          :
al.,                             :    Washington, DC
                                 :
                                 :
              Defendantss.       :
. . . . . . . . . . . . . . . . . . . . . . . . . . . :

TRANSCRIPT OF STATUS CALL  PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT JUDGE


APPEARANCES:


  For the Plaintiff:        Thomas M. Beck, Esq.
                            JONES DAY
                            51 Louisiana Avenue, NW
                            Washington, D.C.  20001
                            202.879.3939


  For the Defendants:       Stehpen Koslow, Esq.
                            IUE-CWA, AFL-CIO
                            501 Third Street
                            Washington, D.C.  20001
                            202.434.1404



  Court Reporter:           SCOTT L. WALLACE, RDR, CRR
                            Official Court Reporter
                            Room 6413, U.S. Courthouse
                            Washington, D.C. 20001
                            (202) 354-3196
                            scottlyn01@aol.com.

<u>**MORNING SESSION, AUGUST 29, 2007**</u>

(9:44 a.m.)

THE DEPUTY CLERK:  Civil Action 07-834, Verizon Services Corporation, Incorporated versus Communication Workers of America and AFL-CIO, et al.  For plaintiffs, Mr. Beckwith, for counsel, Mr. Koslow.

THE COURT:  All right.  Good morning.

ALL PARTIES PRESENT:  Good morning.

THE COURT:  Let me invite both of you up to the podium there.  I did receive your filings.

Mr. Beckwith, perhaps I should ask you first on behalf of Verizon, I note that Verizon is requesting, quote unquote, only limited discovery.  I was wondering what discovery, if any, you think is necessary.  What is it you would seek to discover?

MR. BECKWITH:  I think we called it limited, Your Honor, because we genuinely intend to get it done quite quickly.  We anticipate that the Court may find that this agreement that is at issue here may not be entirely clear on its face and some external extrinsic evidence may by appropriate to discern the intent of the parties, since they so clearly disagree about the intent of the agreement.

There may be some bargaining history that may be enlightening for the Court in ruling on this issue, and also we have an understanding that CWA, the defendant, has some similar, if you will, MOAs, neutrality agreements with other telephone

1    companies that we read differently from the one we have, and

2    those other agreements with other parties include language to the

3    effect that post-election objections may be submitted to the

4    third party neutral or the arbitrator and that sheds light on our

5    agreement, because of the absence of such language in our

6    agreement.

7          So the parties, in comparison, did not intend to permit

8    the third party neutral to address post-election objections that

9    were made under our particular agreement.

10         THE COURT:  Remind me what you said, then, about the other

11   agreements and how it contrasts with respect to the issue of

12   permitting post-election challenges.

13         MR. BECKWITH:  Well, Mr. Koslow's client is asserting to

14   the Court that it can bring elections to the -- excuse me, it can

15   bring objections to the third party neutral even after a campaign

16   and after an election has been held and after the results of that

17   election are certified.  We say, no, you can't do that, that's

18   absolutely contrary to the intent of this agreement and the

19   parties entering into this agreement.

20         The agreement -- to be candid, the agreement doesn't say

21   "you may" or "you may not" in very explicit terms, and so that's

22   the reason I say some extrinsic evidence may be enlightening to

23   the Court.  We believe there are agreements that CWA has with

24   some other telephone companies and some other entities that does

25   have explicit language to the effect that post-election

1    objections may be brought to the third party neutral.

2         So if you hold one of those other agreements up against

3    our agreement, you will be able to contrast them and see that our

4    agreement does not permit -- the correct reading and inference to

5    draw about our agreement is it does not permit such post-election

6    objections.

7         THE COURT:  Can I hear from you briefly on that.

8         MR. KOSLOW:  Certainly.  If the Court looks at the

9    complaint, the answer, the arbitrator's --

10        THE COURT:  Let me ask you to be as close to the mike as

11   you can to make sure we get it fully recorded.

12        MR. KOSLOW:  The arbitrator's decision on this issue, it

13   will be clear up to this moment both parties have contended that

14   this issue of what I would call timeliness of the union's

15   objections can be resolved by the face of the MOA.  There's no

16   need to refer to anything else.  And, indeed, the arbitrator

17   didn't find it necessary to refer to anything else.

18        Now, it may be in the arbitration that's under way, and I

19   believe it's half over --

20        THE COURT:  Is it still scheduled to end -- forgive me for

21   interrupting, is it still scheduled to end in October?

22        MR. KOSLOW:  There are four dates in October that the

23   parties have agreed to continue the hearing.  It may be that in

24   that hearing -- I'm not counsel in that hearing, so I don't know

25   what's going on, that Verizon will introduce evidence of the kind

1    that it's discussing now as to that procedural issue of

2    timeliness, and who knows what the arbitrator is going to rule on

3    that.  It's certainly opened him to rule one way or another.

4         THE COURT:  Well, I guess that helps me more in terms of

5    whether it makes sense to wait for the arbitrator's ruling versus

6    whether eventually there may be some need for me to determine

7    extrinsic evidence, and whether it makes sense, then, to build in

8    a period of some limited discovery.

9         MR. KOSLOW:  May I speak directly to that?

10         THE COURT:  All right.

11         MR. KOSLOW:  I think there are five reasons that mitigate

12    in favor of a limited stay of the kind that we've suggested.  The

13    first is that, as I said, nobody knows how this arbitrator is

14    going to rule.  We may be unhappy.  The company may be happy.  In

15    any event, the parties may reconsider their enthusiasm for this

16    litigation after the arbitration occurs or the decision occurs,

17    which will be in short order because the MOA provides that the

18    arbitrator must make that decision quickly and without briefs.

19         Second, the difficulty of a resolution later will be

20    significantly increased by any attorneys' fees that either party

21    have incurred in the interim.  We feel strongly, we think there's

22    ample authority that when a union defeats a groundless attempt by

23    an employer to block arbitration, that the union's entitled to

24    recover its attorneys' fees.

25         Third, Verizon has already stated that it intends to sue

1    to vacate the arbitrator's award if it's not happy with it.

2    That's set forth in the company's May letter to the arbitrator.

3    So, if that happens, then the company's not happy with the

4    arbitration, I assume they'll sue to vacate.  That will be

5    consolidated before you.  And without conceding whether there is

6    any right of review or what the standard would be, I think it's

7    obvious that the whole matter would be before the Court.

8         Fourth, the arbitrator's findings and conclusions will

9    provide a more complete in a fixed backdrop for this Court's

10    consideration of the issue.

11         Although I don't believe that there are any additional

12    facts in need that are legally necessary to decide it, I think

13    it's helpful to the Court to have that backdrop fixed.  The

14    parties will be collaterally estopped from challenging any of the

15    factual determinations that the arbitrator makes because those

16    will have been litigated.

17         So, I think for all those reasons, and because this

18    arbitration award will be rendered soon, it makes sense for the

19    Court to delay proceedings in this case, call the parties back

20    before it as soon as that arbitration award comes out, and see if

21    we can resolve it at that time, or if not, at least find the most

22    expeditious route to resolution of the issues before the Court.

23         MR. BECKWITH:  Your Honor, there were several points.  May

24    I respond to those quickly?

25         THE COURT:  Yes.

1  the stated purpose of this MOA, to get this issue quickly

2  resolved by an arbitrator.

3       THE COURT:  Do you share the pessimism about the speed

4  with which the resolution will occur?

5       MR. KOSLOW:  I'm not trial counsel in that.  I don't know

6  how complex it is.  I do know the arbitrator, once the hearing

7  closes, will have to very quickly decide the case.

8       THE COURT:  Here's what I want to do.  I do want to

9  monitor what is going on with respect to that arbitration

10  proceeding, and to the extent there is a chance that the

11  arbitration proceeding will conclude and resolve some issues, I

12  would prefer to have that happen without a dual tracked system.

13  There's no need to stay the case, however, in part because it

14  seems to me that to the extent there will remain an issue for me

15  to resolve, it will at start be a question about contract

16  interpretation, and I will presume from the beginning that there

17  will be some method by which the meaning of the term should be

18  clear from the face of the contract, and I may not need to resort

19  to extrinsic evidence, which is not the preferred method, as I

20  understand it, of interpreting contracts.

21       What I will do is stay, simply, discovery, but I will put

22  you on a track for filing dispositive motions.  It may well be

23  that between now and then the arbitration will result in

24  something that will have some impact on where we go here.  It may

25  not.  What I'll do, though, is set up a schedule for dispositive

1    consent notice.  If other things arise and I -- and Verizon wants

2    to make an attempt to persuade me that discovery of some kind

3    really will be needed before you file those briefs, then you

4    should seek that in a motion.

5         But I'll go ahead, then, and stay discovery.  I'll set up,

6    however, a schedule for plaintiff filing a dispositive motion by

7    December 21st, I think was the proposed date you had set, and

8    then we'll have the defendant's motion, dispositive motion and

9    opposition due on -- no, that was -- January 11 was was proposed,

10   which is shy of 30 days.  I'm wondering if we should make that a

11   30-day gap.

12        MR. BECKWITH:  No objection to that, Your Honor.

13        THE COURT:  All right.  30 days after December 21st would

14   be, I guess, January -- we would make it January 21st, 2008, and

15   then we'll have the plaintiff's reply and opposition due -- we

16   should probably build in a 30-day period there.  That will be

17   February 20th, 2008.  And then the defendant's reply could be a

18   seven-day period after February 20th.  We'll make that February

19   27th, 2008.  All right.  We'll get out electronically a

20   scheduling order reflecting these dates.  Are there any other

21   things that you wanted to bring up?

22        MR. BECKWITH:  No, thank you, Your Honor.

23        MR. KOSLOW:  No, Your Honor.

24        THE COURT:  All right.  Thank you very much for coming in.

25   You may be excused.

1          (Proceedings adjourned at 10:03 a.m.)

2                      C E R T I F I C A T E
3

4                   I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
5        proceedings in the above-entitled matter.

6        ----------------------------
7               Scott L. Wallace, RDR, CRR
                  Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

```
-----------------------------------------------------X
VERIZON SERVICES                        :
ORGANIZATION INC.,                      :
                    Plaintiff,          :
                                        :       Civil Action No. 1:07 cv 00834 RWR
v.                                      :
                                        :
COMMUNICATIONS WORKERS OF               :
AMERICA, AFL-CIO,                       :
                                        :
                    Defendant.          :
-----------------------------------------------------X
```

## <u>DECLARATION OF MARGARET W. LESESNE</u>

I, Margaret W. Lesesne, declare as follows:

1.      I have been employed in the Legal Department of Verizon Communications Inc. and its predecessors (along affiliates, including Verizon Services Organization Inc., collectively, "Verizon") for more than seven years.  My current job title is Assistant General Counsel.

2.      In my capacity as Assistant General Counsel, one of my areas of responsibility is managing matters involving Verizon's Neutrality and Consent Election Memorandum of Agreement with Communications Workers of America, AFL-CIO ("CWA") related to the former GTE Companies (the "MOA").

3.      The MOA covers all of the former GTE entities presently owned and/or operated by Verizon, which includes operations in more than 20 states.

4.      The MOA does not expire until July 31, 2009.

5.      The question whether the MOA authorizes the Third Party Neutral ("TPN") to entertain post-election objections is a significant matter of disagreement between Verizon and CWA.

6.     From Verizon's perspective, it is extremely important to obtain an expeditious resolution of this question, because the interpretation of the MOA advanced by CWA would permit CWA to drag Verizon into arbitration any time the union loses an election.  I fully anticipate that, if the pending question about the propriety of post-election objections is not resolved by this Court, CWA will continue to assert post-election objections whenever it loses elections, thereby depriving Verizon of the benefit of its bargain under the MOA.

7.     I am managing and working with the outside counsel that represents Verizon in the arbitration before TPN Louis Zigman ("Zigman") related to Communication Workers of America, AFL-CIO ("CWA")'s attempts to organize Verizon 's MCOW facility in Long Beach, California.  I have attended the six hearing days that have occurred thus far in that arbitration, and am thoroughly familiar with the positions of the parties, the evidence that has been presented, the rulings of TPN Zigman, and other aspects of that arbitration.

8.     CWA requested this arbitration after it lost an election at the MCOW facility on April 25, 2007.

9.     In the arbitration, CWA is challenging Verizon's conduct during the organizing campaign that preceded the election at the Long Beach MCOW facility.  In short, CWA alleges that Verizon violated the MOA by taking an anti-union position and campaigning against CWA in the period leading up to the election.

10.     Verizon initially refused to participate in the arbitration because the MOA does not authorize the TPN to resolve post-election objections and CWA's post-election objections are therefore not substantively arbitrable.  However, over Verizon's objection, TPN Zigman agreed to entertain the merits of CWA's post-election objections.  Thereafter, Verizon expressly reserved its right to have the arbitrability question decided by a court while participating in the

arbitration on the merits of CWA's post-election objections.  TPN Zigman has made it clear to the parties that he does not intend to rule on Verizon's argument that CWA's post-election objections are not substantively arbitrable.

11.    TPN Zigman held hearings on four days in August 2008 and on October 23 and 24, 2007.  At this point, after six hearing days, CWA is still presenting its case in chief and has made it clear that it intends to present testimony from several more witnesses.  At the close of the most recent hearing day, CWA's counsel predicted that at least six to eight more hearing days would be necessary.

12.    I expect that it will take three to five hearing days for Verizon to present its case in chief.

13.    The parties have agreed to continue the arbitration hearing on five dates in February 2008 and to continue to schedule additional dates as necessary.  I fully anticipate that additional dates after February 2008 will be necessary.

I have read the foregoing Declaration and declare under penalty of perjury that it is true and correct.

Executed this _19th_ day of November 2007.

Margaret W. Lesesne

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

```
---------------------------------------------------X
VERIZON SERVICES                      :
ORGANIZATION INC.,                    :
                 Plaintiff,           :
                                      :         Civil Action No. 1:07 cv 00834 RWR
v.                                    :
                                      :
COMMUNICATIONS WORKERS OF             :
AMERICA, AFL-CIO,                     :
                                      :
                 Defendant.           :
---------------------------------------------------X
```

## DECLARATION OF DONALD B. HALLER

I, Donald B. Haller, declare as follows:

1.      I have been employed in the Legal Department of Verizon Corporate Services Corp. and its predecessors for approximately 20 years.  My current job title is Assistant General Counsel.  In this capacity, I provide legal advice and support to various Verizon corporate entities, including Verizon Services Organization, Inc. (Verizon Corporate Services Corp. and affiliated corporate entities, including Verizon Services Organization Inc., are hereinafter referred to collectively as "Verizon").

2.      In my capacity as Assistant General Counsel, my area of responsibility is labor and employment matters, including matters related to Verizon's various labor agreements with the  Communications Workers of America, AFL-CIO ("CWA").  I am familiar with the Neutrality and Consent Election Memorandum of Agreement between Verizon and CWA related to the former GTE Companies (the "Verizon/CWA Agreement").

3.      In late April or early May 2007, I had a telephone conversation with Lori Smith ("Smith"), who is an employee in AT&T labor relations.

4.      Ms. Smith told me that she had primary responsibility for administering a Neutrality and Consent Election Agreement between AT&T and CWA (the "AT&T/CWA Agreement"), which initially became effective on July 1, 1999.  Like the Verizon/CWA Agreement, the AT&T/CWA Agreement does not explicitly address whether the Third Party Neutral ("TPN") has jurisdiction to hear post-election objections.  A true and accurate copy of the AT&T/CWA Agreement is attached as Exhibit 1 to this Declaration.

5.      According to my conversation with Ms. Smith, AT&T and CWA amended the AT&T/CWA Agreement in 2000 (the "Amendment").  The Amendment modified the AT&T/CWA Agreement to include a new provision that expressly authorizes the TPN to entertain objections for seven days following an election.  A true and accurate copy of the Amendment is attached as Exhibit 2 to this Declaration.

6.      During our conversation, Ms. Smith told me that, on multiple occasions, CWA orally acknowledged that the TPN had no jurisdiction to entertain post-election objections under the original AT&T/CWA Agreement.  She also told me that CWA specifically sought the Amendment because CWA understood that the original AT&T/CWA Agreement did not permit post-election objections.

I have read the foregoing Declaration and declare under penalty of perjury that it is true and correct.

Executed this 7 0th day of November 2007.

Donald B. Haller

# EXHIBIT 4

Exhibit VI

## MEMORANDUM OF AGREEMENT

### between

### THE VERIZON/GTE COMPANIES

### and

### COMMUNICATIONS WORKERS OF AMERICA (CWA)

### NEUTRALITY AND CONSENT ELECTION

WHEREAS the Communications Workers of America, AFL-CIO (hereafter "CWA" or "the Union"), and Verizon Communications companies, which were subsidiaries of the former GTE Corporation (hereafter the "Verizon/GTE Companies" or "the Companies" or "the Company"), have collective bargaining relationships throughout the United States;

NOW THEREFORE THE VERIZON/GTE COMPANIES AND CWA agree as follows:

This Agreement between Company and the Union covers all understandings between the parties concerning union organizing; access to employees and code of conduct applicable to union organizing efforts.

The Union and the Company recognize that it is in their mutual interest to enhance the success and image of the Company, to acknowledge the Union as a valued partner, and to foster the pride and commitment of the employees. The parties also share the mutual goals of building a world class, high performance enterprise and addressing employment security through business success and employee development. As a means to enhance these goals, the parties will mutually support regulatory and legislative efforts, marketing/sales and service efforts and other business initiatives leading to employment security and Verizon's business success.

The parties also recognize that the Union's goal of growing membership is intrinsically linked to the successful growth of the business. In order to maintain this perspective and to avoid unnecessary confrontation, the parties agree that the following principles regarding neutrality and consent election will be applicable to Verizon's former "GTE Network Services Companies" (Incumbent Local Exchange Carriers and Logistics) **and Verizon Select Services Inc.** This shall be the exclusive means by which the Union, their locals, or individuals acting on their behalf, will conduct an effort to organize eligible employees in the covered Verizon's former "GTE Network Services Companies" (Incumbent Local Exchange Carriers and Logistics) **and Verizon Select Services Inc.** as defined by the National Labor Relations Act.

1.    Employee Choice

Both the Union and the Company support and agree with the principle that the decision as to whether or not to become represented by a union is one that does not belong to either the Union or to the Company. Rather, it is an individual decision that belongs <u>to</u> the employee. With the parties' mutual recognition of this fundamental tenet, the following provisions are intended to establish, encourage and nurture an environment during a union organizing drive that will allow employees to choose whether or not to become represented in a fully informed and uncoerced manner. All negotiations concerning appropriate unit, access, conduct and voting will be performed by Verizon Labor Relations Staff in conjunction with local management and designated Union representatives.

2.    Neutrality

The Company and the Union agree that an organizing drive will be met by a neutral position by the Company. This statement is consistent with and reinforces the previously established principle of employee choice. It should follow that an environment intended to foster employee choice would be a neutral environment and that information communicated by either party would be fact based and not misleading, distorted or disparaging. Neutrality means the following:

(a)    Management will not be anti-union nor will the Union be anti-management.

(b)    Management will not advocate that employees should not vote for a union to represent them.

(c)    The Unions will be afforded reasonable opportunities for access to employees to get their message communicated.

(d)    Management will respond to employee questions and is obligated to correct inaccurate or misunderstood information by employees.

(e)    The Union(s) will be referred to by name and will not be characterized as a "third party" or "outsider".

(f)    Any written information distributed to employees by either party relative to the organizing campaign will be shared with the other. The parties' communications with employees will be shared with the other. The parties' communications with employees will be in accordance with this Agreement.

(g)  Neither party will hire consultants who encourage an adversarial relationship.

(h)  Neither managers nor Union representatives will be personally attacked.

(i)  Neither the Union nor the Company will be attacked as institutions.

(j)  The Company will not conduct meetings for the sole purpose of discussing organizing activities without inviting appropriate Union representatives to attend.

Allegations of violations of these provisions will be handled via the dispute resolution process contained in this Agreement.

3.  Rules

The procedures to be followed are listed below:

(a)  The Union must show a minimum of 50% + 1 show of interest on signature cards of the appropriate unit.

(b)  A vote of 50% + 1 of those votes, validated by the Third Party Neutral (TPN), will determine the outcome.

(c)  If the Union is not successful, another election will not be scheduled for twelve months.

(d)  The TPN will resolve any issue concerning challenged ballots in similar fashion to the National Labor Relations Board (NLRB) process.

4.  Time Bound

It is in the interest of both parties that the organizing campaign be conducted expeditiously.  The Union is therefore obligated to notify management of its intention to conduct a formal organizing drive before it begins.  The date of this notification will "start the clock".  The entire campaign, including the consent election, will be concluded in 90 days. It is the intent of the parties that the 90-day time frame will include discussion and agreement on the unit.  In the event the parties are unable to agree on the unit, the dispute resolution process set forth below will be utilized and the time period will be extended by the number of days required to reach agreement on the unit, but in no event will the total campaign, including resolution of the scope of the bargaining unit and the consent election process exceed 120 days.  If employees vote

not to be represented, the Union agrees not to initiate another campaign (nor continue the current campaign) in that same work group for 12 months from the date of the conclusion of the campaign. This would not preclude the local Union from having contact with the workers in the group. If employees vote to be represented, collective bargaining over the terms and conditions of employment will commence within 60 days and will be limited to the agreed upon unit.

5.    Informed Decision

Both parties agree that employees should be fully informed about all aspects of Union representation. The Union will provide fact-based information to employees as it endeavors to convince prospective members of the merits of being represented by a labor union. Management's role during this process will include:

(a)    responding to individual employee inquiries;

(b)    explaining the organizing process, including obligations and responsibilities; and

(c)    correcting any inaccuracies, misstatements or misunderstandings disseminated by the Union.

6.    Free from Coercion

Consistent with the basic tenet of employee choice, the parties want to ensure that employees have expressed their choice from an informed position and are completely free from any coercion by the Company, the Union or any other party or parties. One way to ensure this objective is to have a NLRB conducted election.

In the alternative, the Company and the Union agree to use a process that is called "Consent Election." This process will work as follows:

(1)    As part of the access discussions, the parties agree to use "Consent Election".

(2)    The Unions shall initiate the consent election process by providing to a TPN proof of support by means of show of interest cards from 50% + 1 of the employees in the unit. The TPN will then notify Verizon Labor Relations Staff and request a list of names, job titles and home addresses. The Company will furnish the list within five working days. The Union will also be furnished with the list. The "show of interest" cards will clearly state their purpose and that a secret ballot consent election will be conducted to determine the will of the unit. If the TPN determines that the Union has a sufficient show of interest, he/she will schedule a Consent Election process in accordance with this

Agreement.

(3)    The election process will be supervised by a mutually selected TPN, whose role is to ensure the integrity of the process itself, and will be conducted within two weeks of the submission of the Union's show of interest to the TPN. Employees will be asked to express their individual preference in a manner that will ensure that their choice will not be known to either party. The TPN will count the votes and advise the parties of the outcome. Consistent with this Agreement, a vote of 50% + 1 of those who vote will control. The parties may have an observer present when the TPN counts the ballots.

(4)    In all cases, the election process shall take place within 14 days of receipt and verification of the Union's show of interest cards by the TPN. In those cases where there is no dispute about the composition of the unit, the election process will be held within seven days. The election may be held at the Company location or at a neutral site as agreed by the parties. The cost of using a neutral site will be split equally by the parties.

If there is a dispute as to composition of the unit, the TPN shall decide the issue within an additional seven days.

7.    Access Agreement

As soon as reasonably practicable after a request by the CWA for access, Verizon Labor Relations Staff, in conjunction with local management and CWA representatives, will meet to discuss the details related to reasonable access to the unit by the CWA representatives. The Union will be allowed reasonable opportunities for access to Verizon facilities. It is the intent and commitment of Verizon and the CWA that the access agreed upon will not interfere with the operation and other normal and routine business activities, plans and programs of Verizon generally, and specifically, the selected unit. Access agreed upon will be in non-working areas and during employee non-working times. Agreements as to eventful access, such as access to conference rooms, will be reasonable in length and there will be reasonable periods between requests for eventful access. However, an uneventful access, such as a prearranged meeting with an individual employee, will not be affected.

If Verizon and the CWA are unable to agree on reasonable access, the TPN will be asked to resolve the issue. Successful access agreements utilized at other units will be looked to for guidance as to what works and is reasonable. Verizon and the CWA commit that they will reach such an access agreement in each instance in an expeditious manner.

8.    Dispute Resolution

(a)    Questions or disputes arising during the course of an organizing effort within a particular unit of non-represented employees will, in all cases, be addressed first by and between the parties themselves and, in particular, Labor Relations Staff in conjunction with local Verizon management and appropriate CWA representatives. It is the intent and desire of Verizon and the CWA that such matters are dealt with by and between the parties themselves, particularly at the local level, without having to resort to the assistance of a third party. It is also agreed, however, that if every good faith and reasonable effort has been made, but the matter unresolved, the process described below will be utilized.

(b)    The TPN will resolve disputes in the manner set forth in this Agreement. Either Verizon or the CWA can refer a question or dispute, unresolved after good faith efforts have been made to resolve the dispute locally, to the chosen TPN by providing three working days' written notice to both the other party and the TPN. The notice will provide concise statement of the question or dispute to be addressed and a statement that the parties have attempted in good faith but have been unable to resolve the matter by and between them.

(c)    If the question or dispute involves a matter related to access (i.e., the nature, event, time, location, individuals involved, etc.) the TPN will fully investigate all relevant facts surrounding the question or dispute. The TPN will then call the parties together and attempt to facilitate resolution of or otherwise mediate the matter.

If, after a good faith attempt at facilitated resolution or mediation, the access question or dispute is still not resolved, the TPN will attempt to render an immediate decision, which includes a method or alternative methods of resolving the perceived problem. However, in no event will the TPN take longer than five days thereafter to render a decision. The decision of the TPN will be final and binding and the parties agree to abide by his/her decision. This process, from the time the TPN is contacted to the time his or her opinion is issued, will not take more than 15 days unless the parties agree otherwise.

(d)    If the dispute involves the appropriateness of the bargaining unit the Union seeks to organize and the parties are unable to agree, after negotiating in good faith for a reasonable time, upon the description of an appropriate unit for bargaining, the issue of the description of such unit shall be submitted to TPN and a hearing

shall be conducted consistent with the rules of the American Arbitration Association. The TPN shall be confined solely to the determination of the appropriate unit for bargaining and shall be guided in such deliberations by the statutory requirements of the National Labor Relations Act and the decisions of the NLRB and Appellate reviews of such Board decisions.

(e)     Regardless of the type of question or dispute that is submitted to the TPN, the parties will each be given a full opportunity to present their positions and supporting factual information prior to the issuance of any opinion. No written briefs will be submitted. There shall be no ex parte contact with the TPN without the concurrence of all parties. Verizon and CWA believe that matters pertaining to these values are best handled by and between the parties themselves and resort to a TPN should be necessary in only a limited number of cases.

Verizon and the CWA agree that the parties may distribute a decision of the TPN to employees in the selected unit but not outside to the public such as the press.

(f)     The parties agree that the process set forth herein shall be the exclusive means for resolving disputes covered by this dispute resolution process, and neither party will utilize any other forum (e.g. NLRB, federal court, etc.) to address issues subject to resolution pursuant to this process.

(g)     All expenses, resulting from the use of the TPN process, shall be split equally by Verizon and CWA.

9.     Acquisitions and Ventures

The parties recognize the rapidly changing nature and structure of the communications industry. Verizon may acquire (or be acquired by) another entity. It has and may in the future form joint ventures or strategic alliances, may license its brand or technology, or may be a financial investor in other entities. The employees in those entities may be non-represented, represented in whole or in the part of the CWA, or represented in whole or in part by some other labor organization. It is not possible to structure a single rule which will apply to all such circumstances and the Company cannot compel other entities to abide by this Agreement.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

```
------------------------------------------------X
VERIZON SERVICES                      :
ORGANIZATION INC.,                    :
                    Plaintiff,        :
                                      :        Civil Action No. 1:07 cv 00834 RWR
v.                                    :
                                      :
COMMUNICATIONS WORKERS OF             :
AMERICA, AFL-CIO,                     :
                                      :
                    Defendant.        :
------------------------------------------------X
```

## ORDER

Having considered Plaintiff and Counterclaim Defendant, Verizon Services Organization Inc.'s Motion to Reconsider the Stay of Discovery in these proceedings, as well as any memoranda and arguments in support thereof or in opposition thereof, the Court hereby GRANTS the Motion. Accordingly, it is ORDERED that, in addition to the other non-deposition discovery originally proposed by Plaintiff in the case management plan submitted on August 24, 2007, each party be permitted to take no more than two depositions of the opposing party (or a witness under the control of the opposing party) and/or a third party.

The schedule in this matter is hereby modified as follows:

**Close of Discovery**                    February 1, 2008

**Dispositive Motions**:                  February 29, 2008

**Opposition Briefs:**                    March 21, 2008

**Reply Briefs:**                         March 28, 2008

SO ORDERED:


_____
RICHARD W. ROBERTS
United States District Judge