MARY K. O'MELVENY
STEPHEN KOSLOW
Communications Workers of America, AFL-CIO
501 Third Street, NW
Washington, DC  20001
Telephone 202.434.1234
Fax 202.434.1219

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

VERIZON SERVICES ORGANIZATION )
INC., )
 )
 Plaintiff and Counterdefendant, )
 )
 v. )  No. 1:07 cv 00834 RWR
 )
COMMUNICATIONS WORKERS OF )
AMERICA, AFL-CIO, )
 )
 Defendant and Counterclaimant. )
 )
 )
 )

## CWA'S OPPOSITION TO VERIZON'S MOTION TO RECONSIDER STAY OF DISCOVERY

 Defendant-Counterclaimant CWA opposes Verizon's Motion to Reconsider this Court's

previously-imposed stay of discovery for the following reasons:

 The discovery Verizon proposes to undertake is unnecessary for the Court's resolution of

Verizon's claim that the Third Party Neutral ("TPN") lacks authority under the parties'

Memorandum of Agreement ("MOA") to hear and determine CWA's objections to Verizon's

pre-election conduct.  The Court need look no further than the wording of the MOA to conclude

that CWA's objections to Verizon's pre-election conduct constitute a "dispute arising during the

course of an organizing effort" which the MOA explicitly empowers the TPN to resolve. Indeed, it is the TPN's duty to do so, for the MOA states that he is responsible for "ensur[ing] the integrity of the [election] process itself." (Exh. 1: MOA at ¶ 6(4)). Verizon does not dispute that the subject matter of CWA's objections—Verizon's alleged pre-election violation of the MOA's neutrality provisions—is covered by the MOA's Dispute Resolution procedure. Indeed, Verizon implicitly concedes that the TPN can hear and determine disputes over violations of the MOA's neutrality provisions if presented to him prior to the conduct of an election. Verizon's sole contention in this suit is that the TPN lacks authority to address CWA's objections to Verizon's pre-election conduct because CWA submitted those objections to the TPN after the election was held. More simply, Verizon contends that CWA's objections were "untimely." Such contentions, commonplace in the arbitration of labor disputes, have long been regarded by courts and arbitrators as "procedural" rather than "substantive" challenges to arbitrability. And, the courts have long and consistently held that such procedural challenges are for the arbitrator to resolve.[1] That is precisely what has happened here. Finding nothing in the MOA to support

---

[1] The issue of procedural arbitrability was addressed in <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S. 543 (1964), wherein the Court stated:

> Doubts whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration . . . <u>Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.</u>

376 U.S. at 557 (emphasis added). See also, <u>Washington-Baltimore Newspaper Guild v. Washington Post</u>, 959 F.2d.288, 292 (D.C. Cir.1992) and <u>Local Union No. 370, IUOE v. Morrison-Knudsen Co.</u>, 786 F.2d 1356 (9th Cir. 1986).

Verizon's claim that the MOA's Dispute Resolution procedure is restricted to resolution of alleged violations of the MOA raised prior to the conduct of an election, the TPN rejected Verizon's challenge to his authority to consider CWA's objections.[2]

Moreover, the "limited" discovery Verizon proposes to undertake is self-evidently irrelevant. Verizon says it wants to depose "a witness from AT&T who is familiar with the bargaining history, scope and application of the neutrality and consent election agreement between AT&T and CWA." (Verizon's Memorandum In Support at p. 6). Verizon's claim underlying the purported need for this discovery — that understandings between CWA and AT&T respecting disposition of post-election objections also apply to the CWA/Verizon MOA — is patently insupportable. Verizon is not a party to CWA's neutrality and consent election agreement with AT&T and was not involved in the negotiation or implementation of that agreement.[3] Moreover, Verizon's Motion mischaracterizes the express terms of the

---

[2] See Exh. 2: TPN Zigman's May 25, 2007 letter re CWA's Request for Order Compelling Arbitration. The MOA contains a broad dispute resolution provision extending to all "questions or disputes" and, nowhere in the MOA, is there any suggestion that post-election objections are to be excluded. The United States Supreme Court long ago established the principle that where a CBA does not exclude a particular grievance from arbitration, then "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." Warrior & Gulf, supra, 363 U.S. at 584-85. Because there exists a presumption in favor of arbitration, the employer who is resisting arbitration bears the burden of proving that the parties did not intend to arbitrate a given dispute. See Westinghouse v. Hanford Atomic Metal Trades Council, 940 F.2d 513, 518 (9th Cir. 1991). In order to *exclude* a subject from arbitration, there must be clear language in the grievance definition, or a specific exclusion in the arbitration clause itself which precludes the dispute at issue. Warrior & Gulf, supra, 363 U.S. at 585; Westinghouse, supra, 940 F.3d at 518-519. Any claimed "exclusion" must be clearly enunciated, and the grievance must clearly fit within the exclusion set forth within the arbitration clause of the collective bargaining agreement. Westinghouse, supra, 940 F.2d at 518-519. Verizon can proffer no argument based on the MOA's text to demonstrate that the parties clearly agreed to exclude from the broad scope of the TPN procedure this dispute over the conduct of the election.

[3] Verizon hangs its tenuous claim to the relevance of the CWA/AT&T agreement on the declaration of Verizon in-house counsel Donald Haller regarding statements Haller attributes to

CWA/AT&T agreement, and the 2000 amendments to that agreement, in particular. The 2000 amendments do not, as Verizon claims, expand the agreement's Dispute Resolution procedure to encompass post-election challenges; rather, the amendments merely clarify what remedies the TPN shall have at his disposal to remedy violations of the agreement.[4]

Verizon also wants to depose a CWA representative regarding "the bargaining history, scope and application of the [CWA/Verizon] MOA and CWA's neutrality and consent election agreements with other telecommunications companies." (Verizon's Memorandum In Support at p. 6). There is no need for discovery into the bargaining history of the CWA/Verizon MOA, since it can be readily determined from the face of the MOA that CWA's objections to Verizon's pre-election conduct are encompassed by the Agreement's Dispute Resolution procedure, i.e., that they are substantively arbitrable. And, the TPN has already resolved the "procedural arbitrability" issue in CWA's favor. As already noted, Verizon's proposed discovery into CWA's negotiations and agreements with other telecommunications companies could not possibly shed any light on whether CWA's agreement with Verizon authorizes the TPN to resolve post-election objections to pre-election misconduct.

Finally, Verizon's request for reconsideration of the Court's stay of discovery is, at best, premature. If the TPN rejects CWA's objections and upholds the results of the election, Verizon's challenge to his authority to hear and determine those objections will be rendered

---

AT&T employee Lori Smith. Offered by Verizon for the truth of Smith's alleged statements, Haller's declaration is pure hearsay, incompetent to support Verizon's motion.

[4] Depending on the seriousness of the violations, the 2000 amendments to the CWA/AT&T Neutrality and Consent Election Agreement authorize the TPN to require posting of notices, issue cease and desist orders, direct postponement of a scheduled election, postpone or bar organizing efforts by the Union, direct an election, or order recognition based on card check rather than an election. (The 2000 amendments to the CWA/AT&T Neutrality and Consent Election Agreement are attached as Exh. 2 to Donald Haller's declaration filed with Verizon's Memorandum In Support).

moot.  On the other hand, should the TPN rule in CWA's favor and direct a new election,

Verizon may, and almost certainly will, sue to vacate the TPN's disposition.  If it chooses to do

so, it can then challenge both aspects of the TPN's decision; i.e., as to the arbitrability of CWA's

objections and as to the merits of those objections.  At that time, Verizon may also renew its

request to undertake the discovery sought here.

Although it opposes Verizon's Motion for Reconsideration of the discovery stay, CWA

agrees with Verizon that the present schedule for submission of dispositive motions should be

extended.  To date, there have been six days of hearings on CWA's objections—four days in

August and two in October, 2007.  Two previously agreed-upon hearing dates in October were

canceled at Verizon's request.  The parties now have agreed to six additional hearing days in

February, with a view to concluding the arbitration.  CWA will need one and one-half to two of

these days to wrap up presentation of its case; Verizon has informed the TPN that it will need

four days to present its case.  There will be no post-hearing briefs.  (Exh. 3:  Declaration of Mark

Bixler; Exh. 4, Declaration of Judith Belsito).  Therefore, barring unforeseen delays, the

arbitration should be concluded in February, and the TPN should render his decision soon

thereafter.  While it is possible for the Court to decide the arbitrability issue in advance of the

TPN's decision on the merits of CWA's objections, CWA submits that the interests of judicial

efficiency and avoidance of piecemeal litigation would be better served by postponing

submission of dispositive motions until after the TPN rules on CWA's objections.

Respectfully submitted,


s/ Stephen Koslow      .
STEPHEN KOSLOW
DC BAR NO. 424700

MARY K. O'MELVENY
D.C. BAR NO. 418890

501 3rd Street NW
Washington, D. C. 20001
Telephone 202.434.1234
Fax 202.434.1219


Attorneys for Defendant  and Counterclaimant
COMMUNICATIONS WORKERS OF
   AMERICA, AFL-CIO,

# EXHIBIT 1

### MEMORANDUM OF AGREEMENT

between

### THE VERIZON/GTE COMPANIES

and

### COMMUNICATIONS WORKERS OF AMERICA (CWA)

WHEREAS the Communications Workers of America, AFL-CIO (hereafter "CWA" or "the Union"), and Verizon Communications companies, which were subsidiaries of the former GTE Corporation (hereafter the "Verizon/GTE Companies" or "the Companies" or "the Company"), have collective bargaining relationships throughout the United States;

NOW THEREFORE THE VERIZON/GTE COMPANIES AND CWA agree as follows:

1.  Understandings set forth in Exhibits I through **X** as listed below become effective **August 1, 2005,** according to their terms.  These Agreements shall supersede or replace existing provisions and shall be deemed to be incorporated into the existing Collective Bargaining Agreements between the Verizon/GTE Companies and their CWA bargaining units except where the included companies or bargaining units may be expressly limited by the Understandings.

    Exhibits I through **X** are:

    | | |
    |---|---|
    | Exhibit I | Domestic Partner Benefits |
    | Exhibit II | Education And Life-Long Learning |
    | Exhibit III | Holidays |
    | Exhibit IV | Hourly Savings Plan (HSP) |
    | Exhibit V | Hourly Savings Plan |
    | Exhibit VI | Neutrality And Consent Election |
    | Exhibit VII | Union Leave Of Absence |
    | Exhibit VIII | Vacation Carry Forward (Banking) |
    | Exhibit IX | Service and Seniority Recognition |
    | **Exhibit X** | **Commuter Advantage Program** |

2.    These provisions shall be effective on **August 1, 2005**.    The parties specifically agree that the terms and conditions set forth in Exhibits I through **X** shall terminate on **July 31, 2009**, or as otherwise extended and agreed in writing by the parties.  If, however, the parties do not reach agreement on successors to Exhibits I through **X**, they shall renew for one year.

VERIZON/GTE COMPANIES

_signature_

_signature_

Date:  6/20/05

COMMUNICATIONS WORKERS OF AMERICA

_signature_

_signature_

Date:  6/20/05

**Exhibit VI**

# MEMORANDUM OF AGREEMENT

### between

## THE VERIZON/GTE COMPANIES

### and

## COMMUNICATIONS WORKERS OF AMERICA (CWA)

### NEUTRALITY AND CONSENT ELECTION

WHEREAS the Communications Workers of America, AFL-CIO (hereafter "CWA" or "the Union"), and Verizon Communications companies, which were subsidiaries of the former GTE Corporation (hereafter the "Verizon/GTE Companies" or "the Companies" or "the Company"), have collective bargaining relationships throughout the United States;

NOW THEREFORE THE VERIZON/GTE COMPANIES AND CWA agree as follows:

This Agreement between Company and the Union covers all understandings between the parties concerning union organizing; access to employees and code of conduct applicable to union organizing efforts.

The Union and the Company recognize that it is in their mutual interest to enhance the success and image of the Company, to acknowledge the Union as a valued partner, and to foster the pride and commitment of the employees. The parties also share the mutual goals of building a world class, high performance enterprise and addressing employment security through business success and employee development. As a means to enhance these goals, the parties will mutually support regulatory and legislative efforts, marketing/sales and service efforts and other business initiatives leading to employment security and Verizon's business success.

The parties also recognize that the Union's goal of growing membership is intrinsically linked to the successful growth of the business. In order to maintain this perspective and to avoid unnecessary confrontation, the parties agree that the following principles regarding neutrality and consent election will be applicable to Verizon's former "GTE Network Services Companies" (Incumbent Local Exchange Carriers and Logistics) **and Verizon Select Services Inc.** This shall be the exclusive means by which the Union, their locals, or individuals acting on their behalf, will conduct an effort to organize eligible employees in the covered Verizon's former "GTE Network Services Companies" (Incumbent Local Exchange Carriers and Logistics) **and Verizon Select Services Inc.** as defined by the National Labor Relations Act.

1.    Employee Choice

Both the Union and the Company support and agree with the principle that the decision as to whether or not to become represented by a union is one that does not belong to either the Union or to the Company. Rather, it is an individual decision that belongs to the employee. With the parties' mutual recognition of this fundamental tenet, the following provisions are intended to establish, encourage and nurture an environment during a union organizing drive that will allow employees to choose whether or not to become represented in a fully informed and uncoerced manner. All negotiations concerning appropriate unit, access, conduct and voting will be performed by Verizon Labor Relations Staff in conjunction with local management and designated Union representatives.

2.    Neutrality

The Company and the Union agree that an organizing drive will be met by a neutral position by the Company. This statement is consistent with and reinforces the previously established principle of employee choice. It should follow that an environment intended to foster employee choice would be a neutral environment and that information communicated by either party would be fact based and not misleading, distorted or disparaging. Neutrality means the following:

(a)    Management will not be anti-union nor will the Union be anti-management.

(b)    Management will not advocate that employees should not vote for a union to represent them.

(c)    The Unions will be afforded reasonable opportunities for access to employees to get their message communicated.

(d)    Management will respond to employee questions and is obligated to correct inaccurate or misunderstood information by employees.

(e)    The Union(s) will be referred to by name and will not be characterized as a "third party" or "outsider".

(f)    Any written information distributed to employees by either party relative to the organizing campaign will be shared with the other. The parties' communications with employees will be shared with the other. The parties' communications with employees will be in accordance with this Agreement.

(g)    Neither party will hire consultants who encourage an adversarial relationship.

(h)    Neither managers nor Union representatives will be personally attacked.

(i)    Neither the Union nor the Company will be attacked as institutions.

(j)    The Company will not conduct meetings for the sole purpose of discussing organizing activities without inviting appropriate Union representatives to attend.

Allegations of violations of these provisions will be handled via the dispute resolution process contained in this Agreement.

3.    Rules

The procedures to be followed are listed below:

(a)    The Union must show a minimum of 50% + 1 show of interest on signature cards of the appropriate unit.

(b)    A vote of 50% + 1 of those votes, validated by the Third Party Neutral (TPN), will determine the outcome.

(c)    If the Union is not successful, another election will not be scheduled for twelve months.

(d)    The TPN will resolve any issue concerning challenged ballots in similar fashion to the National Labor Relations Board (NLRB) process.

4.    Time Bound

It is in the interest of both parties that the organizing campaign be conducted expeditiously.  The Union is therefore obligated to notify management of its intention to conduct a formal organizing drive before it begins.  The date of this notification will "start the clock".  The entire campaign, including the consent election, will be concluded in 90 days. It is the intent of the parties that the 90-day time frame will include discussion and agreement on the unit.  In the event the parties are unable to agree on the unit, the dispute resolution process set forth below will be utilized and the time period will be extended by the number of days required to reach agreement on the unit, but in no event will the total campaign, including resolution of the scope of the bargaining unit and the consent election process exceed 120 days.  If employees vote

not to be represented, the Union agrees not to initiate another campaign (nor continue the current campaign) in that same work group for 12 months from the date of the conclusion of the campaign. This would not preclude the local Union from having contact with the workers in the group. If employees vote to be represented, collective bargaining over the terms and conditions of employment will commence within 60 days and will be limited to the agreed upon unit.

5.    Informed Decision

Both parties agree that employees should be fully informed about all aspects of Union representation. The Union will provide fact-based information to employees as it endeavors to convince prospective members of the merits of being represented by a labor union. Management's role during this process will include:

(a)    responding to individual employee inquiries;

(b)    explaining the organizing process, including obligations and responsibilities; and

(c)    correcting any inaccuracies, misstatements or misunderstandings disseminated by the Union.

6.    Free from Coercion

Consistent with the basic tenet of employee choice, the parties want to ensure that employees have expressed their choice from an informed position and are completely free from any coercion by the Company, the Union or any other party or parties. One way to ensure this objective is to have a NLRB conducted election.

In the alternative, the Company and the Union agree to use a process that is called "Consent Election." This process will work as follows:

(1)    As part of the access discussions, the parties agree to use "Consent Election".

(2)    The Unions shall initiate the consent election process by providing to a TPN proof of support by means of show of interest cards from 50% + 1 of the employees in the unit. The TPN will then notify Verizon Labor Relations Staff and request a list of names, job titles and home addresses. The Company will furnish the list within five working days. The Union will also be furnished with the list. The "show of interest" cards will clearly state their purpose and that a secret ballot consent election will be conducted to determine the will of the unit. If the TPN determines that the Union has a sufficient show of interest, he/she will schedule a Consent Election process in accordance with this

Agreement.

(3)    The election process will be supervised by a mutually selected TPN, whose role is to ensure the integrity of the process itself, and will be conducted within two weeks of the submission of the Union's show of interest to the TPN. Employees will be asked to express their individual preference in a manner that will ensure that their choice will not be known to either party. The TPN will count the votes and advise the parties of the outcome. Consistent with this Agreement, a vote of 50% + 1 of those who vote will control. The parties may have an observer present when the TPN counts the ballots.

(4)    In all cases, the election process shall take place within 14 days of receipt and verification of the Union's show of interest cards by the TPN. In those cases where there is no dispute about the composition of the unit, the election process will be held within seven days. The election may be held at the Company location or at a neutral site as agreed by the parties. The cost of using a neutral site will be split equally by the parties.

If there is a dispute as to composition of the unit, the TPN shall decide the issue within an additional seven days.

7.    Access Agreement

As soon as reasonably practicable after a request by the CWA for access, Verizon Labor Relations Staff, in conjunction with local management and CWA representatives, will meet to discuss the details related to reasonable access to the unit by the CWA representatives. The Union will be allowed reasonable opportunities for access to Verizon facilities. It is the intent and commitment of Verizon and the CWA that the access agreed upon will not interfere with the operation and other normal and routine business activities, plans and programs of Verizon generally, and specifically, the selected unit. Access agreed upon will be in non-working areas and during employee non-working times. Agreements as to eventful access, such as access to conference rooms, will be reasonable in length and there will be reasonable periods between requests for eventful access. However, an uneventful access, such as a prearranged meeting with an individual employee, will not be affected.

If Verizon and the CWA are unable to agree on reasonable access, the TPN will be asked to resolve the issue. Successful access agreements utilized at other units will be looked to for guidance as to what works and is reasonable. Verizon and the CWA commit that they will reach such an access agreement in each instance in an expeditious manner.

8.    Dispute Resolution

(a)    Questions or disputes arising during the course of an organizing effort within a particular unit of non-represented employees will, in all cases, be addressed first by and between the parties themselves and, in particular, Labor Relations Staff in conjunction with local Verizon management and appropriate CWA representatives. It is the intent and desire of Verizon and the CWA that such matters are dealt with by and between the parties themselves, particularly at the local level, without having to resort to the assistance of a third party. It is also agreed, however, that if every good faith and reasonable effort has been made, but the matter unresolved, the process described below will be utilized.

(b)    The TPN will resolve disputes in the manner set forth in this Agreement. Either Verizon or the CWA can refer a question or dispute, unresolved after good faith efforts have been made to resolve the dispute locally, to the chosen TPN by providing three working days' written notice to both the other party and the TPN. The notice will provide concise statement of the question or dispute to be addressed and a statement that the parties have attempted in good faith but have been unable to resolve the matter by and between them.

(c)    If the question or dispute involves a matter related to access (i.e., the nature, event, time, location, individuals involved, etc.) the TPN will fully investigate all relevant facts surrounding the question or dispute. The TPN will then call the parties together and attempt to facilitate resolution of or otherwise mediate the matter.

If, after a good faith attempt at facilitated resolution or mediation, the access question or dispute is still not resolved, the TPN will attempt to render an immediate decision, which includes a method or alternative methods of resolving the perceived problem. However, in no event will the TPN take longer than five days thereafter to render a decision. The decision of the TPN will be final and binding and the parties agree to abide by his/her decision. This process, from the time the TPN is contacted to the time his or her opinion is issued, will not take more than 15 days unless the parties agree otherwise.

(d)    If the dispute involves the appropriateness of the bargaining unit the Union seeks to organize and the parties are unable to agree, after negotiating in good faith for a reasonable time, upon the description of an appropriate unit for bargaining, the issue of the description of such unit shall be submitted to TPN and a hearing

shall be conducted consistent with the rules of the American Arbitration Association. The TPN shall be confined solely to the determination of the appropriate unit for bargaining and shall be guided in such deliberations by the statutory requirements of the National Labor Relations Act and the decisions of the NLRB and Appellate reviews of such Board decisions.

(e)    Regardless of the type of question or dispute that is submitted to the TPN, the parties will each be given a full opportunity to present their positions and supporting factual information prior to the issuance of any opinion. No written briefs will be submitted. There shall be no ex parte contact with the TPN without the concurrence of all parties. Verizon and CWA believe that matters pertaining to these values are best handled by and between the parties themselves and resort to a TPN should be necessary in only a limited number of cases.

Verizon and the CWA agree that the parties may distribute a decision of the TPN to employees in the selected unit but not outside to the public such as the press.

(f)    The parties agree that the process set forth herein shall be the exclusive means for resolving disputes covered by this dispute resolution process, and neither party will utilize any other forum (e.g. NLRB, federal court, etc.) to address issues subject to resolution pursuant to this process.

(g)    All expenses, resulting from the use of the TPN process, shall be split equally by Verizon and CWA.

9.    Acquisitions and Ventures

The parties recognize the rapidly changing nature and structure of the communications industry. Verizon may acquire (or be acquired by) another entity. It has and may in the future form joint ventures or strategic alliances, may license its brand or technology, or may be a financial investor in other entities. The employees in those entities may be non-represented, represented in whole or in the part of the CWA, or represented in whole or in part by some other labor organization. It is not possible to structure a single rule which will apply to all such circumstances and the Company cannot compel other entities to abide by this Agreement.

# EXHIBIT 2

**Louis M. Zigman,** Esq.
473 South Holt Avenue
Los Angeles, CA 90048
(310) 556-3748 – fax (310) 550-8439
email: ziggyjudge@aol.com


May 26, 2007


Via Email and First Class Mail


To:        Willis J. Goldsmith, Esq.
           Mark Bixler
           Paul Gwaltney


From;      Lou Zigman, Esq.


                        Re: Request for Order Compelling Arbitration
                            (Alleged Violations of the National Agreement
                               on Neutrality and Consent Election)

Gentlemen:

        After having considered the positions of the parties and after my review
of the National Agreement (hereinafter the "NCE MOA"), and in noting that I am
making my determination based upon my reading of the NCE MOA along with having
considered the contentions of the parties, I find and conclude that the
arguments and contentions of the union are *persuasive* to the effect that I have
the authority and the responsibility to hear and decide the union's allegations
that the employer violated the terms of the NCE MOA with respect to its conduct
prior to the consent election.

        In this regard, I initially considered the union's arguments that as the
third party neutral I was given that authority to consider the union's
objections under the NCE MOA.

        After considering the union's arguments, I find that the union's arguments
are presumptively persuasive for a number of reasons.

        (1) The union has alleged violations of the NCE MOA.

        (2) The last sentence in Paragraph 2 states:

        "Allegations of violations of these provisions will be handled via the
        dispute resolution process contained in this Agreement."

        (3) Paragraph 8 describes the dispute resolution procedure.

        Paragraph 8(e) sets forth the procedure to be followed, i.e. that the
parties shall be given a full opportunity to present their positions.

        Paragraph 8(f) provides that the dispute resolution process shall be the

1

exclusive means for resolving these disputes.

As such, I found the union's arguments persuasive that a hearing should be scheduled to hear their allegations.

While I note that the company asserts that the parties did not intend to allow post election objections and therefore that I should deny the union's request for a hearing, I didn't find the company's arguments persuasive.

The company's arguments are not persuasive because, contrary to the company's argument, the language in the NCE MOA does not preclude post election proceedings. More particularly, there is no specific language in this agreement that says that post election objections cannot be heard. There is also no specific language in the agreement that specifically says that violations as referenced in paragraph 2 will be barred if they are raised after the counting of the ballots.

While the company has made many arguments which the company asserts demonstrates that the parties mutually intended to bar claims of NCE MOA violations if raised after the counting of the ballots, those arguments are essentially based on the company's interpretation of the different provisions in the NCE MOA – none of which specifically bars the raising of contractual violations following the count of ballots.

It is a rather well accepted principle in labor/management contractual disputes that procedural waivers/forfeitures of claims, i.e. the barring of grievances, must be shown by clear and unambiguous language.  And, as noted above, there is no such language.

While the company has made a collection of arguments, some of which have some degree of logic, the fact remains that the language in paragraph 2 specifically states that allegations of violations of the provisions of the NCE MOA will be handled through the dispute resolution process and paragraph 8(e) gives the TPN authority to hear and decide those issues.

And, as noted above, there is no specific language in the NCE MOA which says that violations of the agreement cannot be raised after the ballot count.

Based on the contractual language above, I found the union's arguments *presumptively persuasive* that allegations of violations of the NCE MOA purportedly committed during the course of the organizing effort are subject to the dispute resolution procedure.

And, since the union alleges that the violations occurred prior to the election, i.e. during the course of the organizing effort, I again found the union's arguments presumptively persuasive that the allegations by the union in its objections to the election falls within the language of the parties' agreement.

And finally, inasmuch as Paragraph 8(f) provides that this process shall be the "exclusive means" for resolving such disputes, I found the union's arguments *presumptively persuasive* that I have the authority and responsibility for hearing the allegations (dispute) and making a determination on the merits of those allegations.

Having found that the union sustained its burden of establishing that I have jurisdiction over the dispute, I considered in more detail the arguments made by the company that I do not have jurisdiction.

2

In this regard, I note the company's contention that these allegations are not properly before me because they were raised AFTER the election (ballot count). In making that argument the company has raised a number of reasons.

Initially, the company points to the language in 8 (a) and (b) which provides for an expeditious manner for resolving their disputes. While I agree that paragraphs 8(a) and 8(b) provides for an expeditious manner for resolving disputes and while it is evident that one of the important goals of the NCE MOA is to have an expeditious organizing campaign and election, nevertheless the company's argument that the union is *barred* from raising these issues after the ballot count is *not persuasive*.

That argument is not persuasive for a number of reasons.

The argument that the parties *intended and agreed* to bar disputes raised after the ballot count is not persuasive because as noted above, the NCE MOA does not specifically bar such disputes. In other words, there is no language which specifically says words to the effect that: "neither party may file objections to the election after the counting of the ballots," or that "violations of the agreement occurring before the election but not raised until after the election are untimely and barred and/or are not subject to the dispute resolution process."

While the company argues that the language in the NCE MOA "is clear" and clearly demonstrates that these "disputes" are indeed barred, the company's characterization of the intent of the parties is essentially gleaned from the company's own interpretation" and the company's own "characterization" of how it reads and interprets the different provisions of the NCE MOA.

Again, while the company states that "the TPN has no authority to address the parties' conduct after the ballot count begins," I note that there is no specific language in the NCE MOA that specifically precludes the TPN from addressing issues raised <u>after</u> the ballot count.

While I agree that the NCE MOA does not specifically say that the TPN has the authority to hear the allegations raised by the union, I found the union's arguments more persuasive than the company's arguments because the language in paragraph 2 clearly covers violations of the agreement and also because other disputes under paragraphs 8(a) and 8(e) are not limited to by any time constraints.

As noted above, and as a further basis for finding the union's arguments more persuasive than the company's arguments, I note that it is a rather widely accepted principle when construing contractual language in labor/management disputes that unless there is specific language providing for a waiver of claims that such waivers/forfeiture of claims must be shown by clear and unambiguous language. Examples of such forfeitures are when parties specify that if grievances are not filed within a particular number of days that the grievances will be considered null and void and barred from the grievance procedure. As noted above, the NCE MOA does not include language which specifically bars disputes from being raised after the ballot count.

Interestingly, the parties did place a "limitation" on disputes to be resolved in their dispute resolution procedure and the limitation requires that the dispute must have arisen *during the course of the organizing effort*. And, as noted above, the union asserts that the violations did arise during the organizing effort.

3

While I agree that one can argue that because the parties agreed to follow certain NLRB procedures and by not specifically incorporating NLRB objection procedures that the parties did not intend to allow post election challenges to the election, that argument is *not persuasive* because (1) there is no specific language saying that violations raised after the ballot count will be barred, and in light of the fact that paragraph 2 does specifically allow the union to file claims of violations of the NCE MOA through the dispute resolution procedure – a procedure that does not impose a time constraint on those claims.

Turning next to the company's contention that the 2005 TPN: "award interpreted and applied the MOA in exactly the same way," I did not find that characterization persuasive. The TPN's "award" and the reference to his jurisdiction is in one sentence to wit:

"John Wells will retain jurisdiction through the cooling off period and campaign <u>and election</u> to immediately resolve any disputes the parties are unable to resolve…"  (My emphasis).

I note that nowhere in his ruling did TPN Wells say that he had no jurisdiction to resolve disputes that may occur before the ballot count and be raised after the count.

The company's contention that TPN Wells "retained jurisdiction through the election… <u>not</u> at any point <u>after</u> an election has been conducted," is simply the *company's interpretation* of a one sentence ruling.  (My emphasis)

As such, the argument based on the 2005 TPN's ruling is not persuasive.

That argument and the reliance on the 2005 TPN ruling is also not persuasive because in the parlance of labor/management relations it is widely held that jurisdiction in an organizing election customarily continues to apply to allegations of misconduct by either party before the election that may have affected the outcome of the election.

And, pursuant to that generally accepted principle of considering misconduct by either party in terms of the propriety of the election, along with the language in paragraph 2 along with the broad language in paragraphs 8(a) and 8(e) of the word dispute, as well as the absence of specific waivers, I agree that the union's interpretation of the NCE MOA is consistent not only with the language in this agreement but also with generally accepted practices in the labor management community.

Turning to the next argument by the company that to allow post election challenges would frustrate the entire election process, I again did not find that argument persuasive.

While I agree that there is logic in the company's argument that the parties provided in paragraphs 8(a) and 8(b) for a procedure to identify and to try to resolve disputes during the organizing effort expeditiously with short time limits that doesn't mean that the parties agreed to bar any disputes and/or claims of violations of the NCE MOA simply because they provided for the mechanism in paragraphs 8(a) and 8(b).  *That "bar" is merely supposition based upon the company's interpretation of that language and other language in the NCE MOA.  And because there is no clear bar written into these provisions, one cannot be inferred.*

Additionally, as to the company's contention that the union's

4

interpretation would be extremely prejudicial to the parties and to the employees themselves because of the parties' goal of having an expeditious election process, I did not find that argument persuasive given the fact that the *primary purpose* of the election agreement (paragraphs 1 and 2) is to guaranty employees' a freedom of choice and a process free from coercive conduct. And, as noted before, in the absence of specific language demonstrating that the parties intended to preclude objections based upon purported violations of the agreement, I found the union's arguments persuasive that the NCE MOA does allow for the adjudication of purported violations to be raised after the ballot count – and furthermore that the arguments of the union are actually more consistent with the primary goal of these parties than the argument based on the expeditious nature of the process.

The company argues that other provisions in the NCE MOA, i.e. paragraphs 3, 6 and 8(f) demonstrate that since the parties specifically agreed to the inclusion of certain NLRB procedures and did not include NLRB post election objections that the objections filed by the union were not to be permitted.

While I have already dealt with this argument above, I also note that none of those paragraphs makes any reference to the union's right to raise objections after the election and more specifically, as noted throughout my analysis, none of the provisions specifically bars the union from doing so.

Without going into detail, I note that the company's arguments based on Paragraphs 1 and 4 were also not persuasive.

And finally, I do not find the company's argument persuasive that I should await the outcome of its motion filed in federal court seeking to overturn the union's objections.

In this regard, I note that I have been given the authority for resolving questions or disputes that arose during the organizing effort. Furthermore, since the union has raised violations of the NCE MOA it is my responsibility to interpret the parties' agreement and I have.

Inasmuch as I find the union's arguments persuasive that I have jurisdiction and the authority under the parties' NCE MOA to resolve the particular disputes raised by the union in its objections filed on April 25, 2007 and inasmuch as the language in paragraph 8(e) is very specific in setting forth the exclusive authority of the TPN to resolve disputes subject to this resolution process, and in further noting that under paragraph 8(e) that the parties agreed that neither party shall utilize any other forum, e.g. federal court, I do not find the company's arguments persuasive that I should decline to take any action until there is a final ruling from the courts.

For all of the reasons stated above, and in light of any other arguments raised by the company but not specifically addressed above, I hereby order and direct that a hearing be held to consider the union's allegations that the company violated the provisions of the NCE MOA with respect to the conduct of the election.

My availability to convene the hearing is as follows:

June 4, 5, 6, 9, 13 – possibly June 14, 15

July 9

    Kindly let me know which days you are available or alternative dates if none of the aforementioned are possible.

Respectfully submitted,


Louis M. Zigman, Esq.
Third party Neutral

# EXHIBIT 3

MARY K. O'MELVENY
STEPHEN KOSLOW
Communications Workers of America, AFL-CIO
501 Third Street, NW
Washington, DC   20001
Telephone 202.434.1234
Fax 202.434.1219

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| VERIZON SERVICES ORGANIZATION INC., | ) ) ) |
| Plaintiff and Counterdefendant, | ) ) |
| v. | ) No. 1:07 cv 00834 RWR |
| COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, | ) ) ) |
| Defendant and Counterclaimant. | ) ) ) ) ) |

## <u>DECLARATION OF MARK BIXLER</u>

I, Mark Bixler have personal knowledge of the facts below and, if called upon as a witness, could and would competently testify to the truth of said facts.

1.     I am Area Director for District 9 of the Communications Workers of America ("CWA").  My responsibilities include directing organizing efforts among employees of Verizon Services, Inc. ("Verizon").

2.     I have been involved in the scheduling of hearing dates before Third Party Neutral Lou Zigman ("TPN") on CWA's objections to Verizon's pre-election conduct in connection with CWA's organizing efforts at Verizon Services MCOW facility and I have been present throughout the hearing to date.

1

3.       CWA initially proposed commencing the hearing in June 2007. Verizon objected to beginning the hearing before August 2007. The TPN held four days of hearing in August and the parties agreed to another 4 days of hearing in October. However, there were only two days of hearing in October due to Verizon's canceling the remaining hearing dates.

4.       On the second day of hearings in October, the parties conferred with the TPN to schedule a sufficient number of additional hearing days to bring the arbitration to a close. CWA's attorney Judy Belsito told the TPN that CWA would need only one and one-half to two additional days to conclude presentation of its evidence. Verizon's attorney Robert Ford stated that Verizon would need four days to present its case. CWA proposed several January dates, but Verizon insisted instead on resuming the hearing in February. Based on the parties' respective estimates of the time each would need to complete presentation of their evidence, six hearing dates were agreed to: February 4, 5, 6, 13, 14, 15, 2008.

5.       Barring any unforeseen delays, the hearing before the TPN should conclude in February 2008. By agreement, the parties are not going to submit post-hearing briefs. The TPN should render his decision on CWA's objections soon after the hearing closes.


I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on November 27, 2007 in Santa Fe Springs, California 90670.

MARK BIXLER

2

# EXHIBIT 4

MARY K. O'MELVENY
STEPHEN KOSLOW
Communications Workers of America, AFL-CIO
501 Third Street, NW
Washington, DC  20001
Telephone 202.434.1234
Fax 202.434.1219

### UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| VERIZON SERVICES ORGANIZATION INC., )<br><br>    Plaintiff and Counterdefendant, )<br><br>v. )<br><br>COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, )<br><br>    Defendant and Counterclaimant. ) | No. 1:07 cv 00834 RWR |

### DECLARATION OF JUDITH G. BELSITO

I, Judith G. Belsito, am the District Counsel for the Communications Workers of America, AFL-CIO.  I have personal knowledge of the facts set forth below and, if called upon as a witness, could and would competently testify to the truth of said facts:

1.      I have been the District Counsel for the Communications Workers of America, AFL-CIO (hereafter "CWA") since February 1997.  I represent CWA in many matters and am the counsel for CWA in the hearings between Verizon, California ("Verizon") and CWA before Arbitrator Lou Zigman as provided for in a Memorandum of Agreement between CWA and Verizon concerning neutrality and consent elections.

1

2.    I have represented CWA at each of the days of hearings, and in all negotiations between CWA, Verizon and Arbitrator Zigman concerning the scheduling of all hearing dates.

3.    I, on behalf of CWA, initially proposed commencing the hearings in June, 2007. Verizon insisted that the hearings could not begin until August 2007. The parties initially scheduled the dates of August 1, 2, 3, 9 and August 10, 2007. The hearings were held on August 1, 2, 3 and 9, 2007. The Arbitrator cancelled the hearing of August 10, 2007.

4.    The parties also scheduled October 23, 24, 25 and 26, 2007 for hearing. Hearings were held on October 23 and October 24, 2007. Verizon cancelled October 25 and October 26.

5.    On October 24, 2007, the last day that the parties met at hearing, we discussed the need for further dates of hearing I stated that CWA would need about one and one half (1 ½) to two(2) more days for our witnesses. CWA proposed dates in December and January. Robert Ford, the counsel for Verizon said that it had several witnesses and could not meet until February, 2008. We therefore scheduled six additional days in February, February 4, 5, 6, 13, 14, 15, 2008.

6.    During these discussions on October 24, 2007, based upon the entire discussions between Verizon and myself, it was always my understanding that the six scheduled days in February would be sufficient to conclude the hearings. If I had any understanding that Verizon needed more days of hearing, I would have insisted that we then schedule them along with the six hearing dates in February.

2

I declare under penalty of perjury under the laws of the United States of America, that the

foregoing is true and correct.

Executed on November 27, 2007 in Venice, California 90291.

JUDITH G. BELSITO

3